## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

GEORGE BLACK,

     *Plaintiff,*

  v.

THE CAPITAL MARKETS COMPANY,
LLC,

     *Defendant.*

No. _____

**COMPLAINT and JURY DEMAND**

Plaintiff George Black, by his attorneys, Granovsky & Sundaresh PLLC, for his Complaint against Defendant The Capital Markets Company, LLC ("Capco") alleges as follows:

### NATURE OF ACTION

1.    George Black has lost his livelihood.

2.    He lives in New Jersey with his wife, his three children, and his wife's parents. He is the sole provider for that family of seven—or he *was* their sole provider, until his former employer, Defendant Capco, took steps to interfere in his career and to deprive him of income.

3.    Mr. Black worked for Capco with loyalty and integrity for eight years.

4.    In 2018, Capco presented Mr. Black with a Business Protection Agreement (the "BPA") and gave him no true choice but to sign it or resign. Mr. Black signed. Under the purported terms of the BPA, Mr. Black would be prohibited from taking certain roles at Capco competitors for 12 months after his employment with Capco ended.

5.     However, the BPA also commits Capco to not unreasonably withhold consent for Mr. Black to join a competitor, if the role would be in a part of the competitor's business that did not compete with Capco.  That commitment, to not unreasonably withhold consent, is at the center of this complaint.

6.     In 2022, Mr. Black was offered a role as a principal at Deloitte, one of the so-called "Big Four" accounting and consulting firms.

7.     Mr. Black promptly sought Capco's consent to join Deloitte.   Capco objected, saying that Deloitte was a competitor.   In response to Capco's concerns, senior management at Deloitte created a new, non-competitive role within Deloitte, a role specifically designed for Mr. Black, one that would prevent even the possibility of Mr. Black violating the terms of his BPA.

8.     However, inexplicably, Capco has turned on Mr. Black. Capco unreasonably refuses to consent to George Black taking <u>any</u> role at Deloitte. Instead, Capco has threatened Mr. Black with injunctions, has made false allegations about Mr. Black to Deloitte, and has drummed up phony concerns about the attempted misappropriation of confidential information.

9.     Mr. Black and his family have been without income since Mr. Black's separation from Capco on July 29, 2022. Unless Capco gives consent, or is compelled to give consent, Mr. Black and his family may be without income for an entire year.

10.     Mr. Black brings this lawsuit in pursuit of those most fundamental rights:  the right to pursue his chosen career and the right to earn a living.

## PARTIES

11.     Plaintiff George Black is a citizen and resident of New Jersey.

12.     Defendant The Capital Markets Company, LLC ("Capco") is a Delaware limited liability corporation with its principal place of business in New York.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1332(a)(1) because this is an action between citizens of different states, and the amount in controversy exceeds $75,000 exclusive of interest and costs.

14.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1) because Capco is subject to personal jurisdiction in this district.

## STATEMENT OF FACTS

*George Black's Career at Capco*

15.     Prior to joining Capco, George Black spent the bulk of his career at Lehman Brothers (2002-2008) and Barclays Capital (2008-2014). Mr. Black held roles in technology and in the front office during his time at these firms. Through this experience he developed expertise in many of the businesses and functions in financial services, a deep knowledge base in capital markets, and a valuable skill set in managing transformation.

16.     Mr. Black joined Capco in July of 2014 as a Managing Principal with a dual mandate for sales and delivery. In this role, Mr. Black would lead client engagements by managing teams of Capco consultants, and he would also drive sales through various business development activities.

17.    On August 1, 2017, Mr. Black was promoted to the role of Associate Partner.

18.    In September 2018, Mr. Black took on the additional leadership role of U.S. Head of Capital Markets.

19.    Capital markets is the sector of the financial services industry that deals primarily with the core businesses of an investment bank—specifically securities, derivatives and investment banking, as well as the various functions that support these businesses, such as sales and trading, risk management, regulatory compliance, finance and operations. Capital markets does not include the businesses of a retail or commercial bank, nor the relevant supporting functions, i.e., credit cards, mortgage lending, wealth management, and core banking.

20.    In September 2021, Mr. Black was promoted to the role of Partner.

21.    "Partner" was a title Capco gave to certain employees, but it was not an indication of ownership.  As a Partner, Mr. Black always remained an employee-at-will at Capco.  At no point did Mr. Black own any portion of Capco.  He had no vote or say in firm-wide strategy or governance.  He had no visibility into the firm's profitability or global performance.  He did not share in the profits of the firm.

22.    Mr. Black's daily responsibilities as an Associate Partner and Partner at Capco included management of multiple engagements across clients, maintaining relationships with Capco team leadership, his clients and prospective clients, and qualifying and proposing client engagements. Mr. Black had additional responsibilities as the U.S. Head of Capital Markets, which included ensuring that the consultants in his domain created a portfolio of sales offerings that were

compelling for his Capital Markets client base and that represented the expertise of the Capital Markets domain to new and existing clients.

23.    Capco's client base is exclusively in the financial services sector.  Mr. Black's clients, who were primarily large broker-dealers or banks that operated in capital markets, were a subset of Capco's client base.  Mr. Black typically managed 4-5 engagements simultaneously, and typically managed a list of 6-8 Capital Markets clients that he would routinely contact.

24.    Mr. Black reported to the Managing Partner of the United States: Michael Pugliese prior to March 31, 2022; and then Michael Ethelston from April 1, 2022 until Mr. Black's final day with Capco on July 29, 2022.

25.    As a Partner, Mr. Black participated in two weekly meetings that were frequently attended by both Partners and non-Partners. These meetings were focused on reviewing the financial performance of the U.S. business at a high level, reviewing the available resources and reviewing the sales pipeline. There was no specific or proprietary Capco information disclosed in these meetings, and except for rare occasions (i.e., approximately once or twice a year) any such meetings always included non-partner participants from the consulting business, the marketing team, the recruiting team, and/or the finance team. Mr. Black participated monthly in a meeting to coordinate across his peers in Capital Markets in other regions, with a primary goal of identifying opportunities to work together. Other than these sessions, Mr. Black was not regularly involved in any Partner-level meetings where confidential information was shared or discussed.

*George Black signs the BPA*

26.    In January 2018, George Black and Capco entered into a Business Protection

Agreement (the "BPA").  The BPA is attached hereto as **EXHIBIT 1**.

27.    The BPA was drafted exclusively by Capco.  Mr. Black had no opportunity to

draft or negotiate any terms of the BPA.  All Capco Partners were required to sign

the BPA, in conjunction with Capco's acquisition by Clayton Dubilier & Rice, LLC,

which occurred in July 2017.

28.    The BPA contains, among other terms, protections for Capco's Confidential

Information (Section 4), and post-employment restrictive covenants imposed on Mr.

Black (Section 6).

29.    Sections 6.3.1 through 6.3.9 of the BPA enumerate certain restrictive

covenants, covering Clients, Potential Clients, Restricted Suppliers, Key Employees,

and Restricted Partners, among other things.

30.    Section 6.3.10 of the BPA purports to set out a non-compete, stating that Mr.

Black:

> shall not, directly or indirectly, either alone or jointly with or on behalf
> of any person, firm, company or entity or in any Capacity … for twelve
> (12) months after Termination, in any Capacity be involved with any
> business concern situated within the Territory or which provides
> services to Clients situated within the Territory which is, will be, or is
> planning to be in competition with any Restricted Business.

31.    However, the scope of Section 6.3.10 is significantly limited by Section 6.5 of

the BPA, which states that:

> In the event that you [Mr. Black] wish to be employed or engaged by a business concern within the scope of clause 6.3.10 but where you will be solely involved with the part of its business which does not compete (or intend to compete) with any Restrictive Business then you may apply in writing to the Group CEO for his approval. Provided that you seek approval prior to accepting such employment or engagement the Group CEO will not unreasonably withhold or delay his consent where he is satisfied with the arrangements for ensuring that you are not involved in the Restricted Business and that there is no risk of the inadvertent disclosure of Confidential Information.

32.    The BPA defines the "Territory" to mean "the US, as well as any additional territories for which you are given responsibility during the course of your Employment."

33.    The BPA defines "Restricted Business" broadly to include "the business of the Company or any Relevant Group Company with which you were materially involved during the Look Back Period," where the "Look Back Period" is defined as the 12-month period prior to Mr. Black's termination.

### *Deloitte Extends an Offer to George Black*

34.    Deloitte first approached Mr. Black in June 2021 to see if Mr. Black would be interested to meet some of their leadership and explore potential options to join their firm.

35.    Deloitte is the largest professional services organization in the world.  Deloitte has approximately 120,000 employees in the United States, as compared to Capco's approximately 1,200 employees in the United States.  Deloitte provides audit, tax and consulting services to clients in every industry and sector; Capco provides consulting services only in the financial services sector.

36.     The possibility of moving to Deloitte appealed to Mr. Black, but he enjoyed his role at Capco, and communicated that to Deloitte.  He told Deloitte that he would be interested to meet people and see where the discussions led.

37.     Mr. Black met with several Deloitte leaders between August 2021 and December 2021, at which point Mr. Black expected that Deloitte would make an offer, but he understood that the internal process at Deloitte would require an extended amount of time.

38.     Over the next several months, the Deloitte approval process progressed and culminated in an offer being sent to Mr. Black on July 13, 2022.

39.     During this time, Mr. Black maintained his strong performance at Capco, leading several winning pitches for his clients, supporting multiple accounts, driving Capco's Capital Markets domain and running multiple projects that required his direct involvement and expertise.

40.     Mr. Black made Deloitte aware of the Capco BPA from early in their discussions, and Deloitte was eager to understand Mr. Black's post-employment restrictions under the BPA.

41.     Deloitte and Mr. Black structured their negotiations to ensure compliance with the BPA.  The offer that Deloitte ultimately extended to Mr. Black reflected Mr. Black's and Deloitte's deference to Capco's protected interests in several ways. For example, and without limitation:

> a. As an explicit condition of its offer, Deloitte insisted that Mr. Black promise to honor all of his commitments to Capco under the BPA.

b.  As an explicit condition of its offer, Deloitte would not permit Mr. Black to join Deloitte until either (i) the 12-month term of the non-compete provisions in Section 6.3.10 of the BPA had expired, or (ii) pursuant to Section 6.5 of the BPA, Capco had issued a written waiver of the non-compete provisions in Section 6.3.10 of the BPA.

c.  Deloitte hoped to bring on Mr. Black in a client-facing role, with an expectation that there would be specific financial services clients or sectors that Mr. Black would be prohibited from covering. However, Deloitte understood that Capco might not waive the non-compete provisions in Section 6.3.10 of the BPA for such a role. So, in the alternative, Deloitte and Mr. Black agreed that Deloitte would be prepared to create an entirely internal, non-client-facing role for him, so that he could join Deloitte immediately in a part of the business that did not compete with Capco.

d.  The intention of this alternative approach was to create a role which safeguarded Capco's interests such that Capco would not have an objection to Mr. Black joining Deloitte.

42.   Ultimately, senior management at Deloitte conferred and created precisely such an internal non-client-facing role for Mr. Black (the "Internal Role").

43.   The contours of the Internal Role were as follows:

a.  Mr. Black will not have <u>any</u> client service responsibilities in this internal role, which will last at a minimum for the duration of the time period

9

covered by the BPA. He will be embedded in the Office of Executive &
Transformation ("OET"). The OET is part of the Deloitte National
Office, and exists to enable strategic internal priorities, across all
industries (not only financial services).

b. In this role, Mr. Black will collaborate with his peers from across
Advisory Leadership to support and drive internal initiatives including:

   i. Improving the adoption of new tools and technologies related to
   the Future of Work;

   ii. Assessing and recommending changes to streamline Deloitte's
   back line support functions to better enable the success of front-
   line consultants;

   iii. Collaborating with the Senior Talent enablement team to identify
   opportunities to improve the work experience, culture, talent
   development and succession planning within the Senior Talent of
   the firm across industries; and

   iv. Support the adoption of broader culture initiatives, focusing on
   increasing Collaboration, Innovation and Integration between
   Industry groups and Offering groups.

c. Mr. Black will have no responsibility whatsoever for Deloitte business
in capital markets.

d. For the duration of the BPA, in this Internal Role at Deloitte, Mr. Black
will essentially vanish from the capital markets world. Deloitte will not

directly or indirectly allow Mr. Black to communicate with his former clients, nor will any financial services client directly or indirectly receive Mr. Black's work product in a deliverable.

44.     Deloitte never asked Mr. Black to cover clients that were Clients or Potential Clients of Capco (as defined by the BPA). Deloitte has agreed to limit the responsibilities that Mr. Black will have for the term of the BPA, and is not asking him to do any job functions that are in any way similar to his role at Capco.

45.     For his part, Mr. Black negotiated with Deloitte specifically to ensure compliance with the BPA. For example, he has agreed to take the Internal Role even though the Internal Role might not be an optimal use of his experiences or skills.

46.     Deloitte sent Mr. Black the admission agreements, partnership agreements and other papers that together constituted his offer from Deloitte at about 10:30 in the morning of Wednesday, July 13, 2022.


***George Black Resigns from Capco***

47.     After receiving the offer from Deloitte, on Wednesday, July 13, 2022, George Black informed Capco that he intended to resign from Capco and accept a position as a partner at Deloitte.

48.      He immediately expressed to both the Head of HR at Capco, Mary Keller, and to his Managing Partner at Capco, Michael Ethelston, his sincere desire and intent to coordinate a seamless transfer of his responsibilities. He also immediately told Mr. Ethelston that he was seeking approval from Capco for him to accept a role at

Deloitte, as provided in Section 6.5 of the BPA. All parties agreed to meet in person on July 14, 2022.

49.    On July 14, 2022, Mr. Black travelled to Capco's office in New York.   He scheduled time with Mr. Ethelston and Ms. Keller to meet at noon that day.

50.    During that noon meeting, Mr. Ethelston asked Mr. Black to discuss the transition that would be required, and specifically asked about Mr. Black's opinions regarding which of his peers would be Mr. Black's choice to manage certain client and Capital Markets domain responsibilities.    Mr. Black enumerated specific engagements and pursuits that should be covered immediately, and recommended successors for all of his responsibilities. These recommendations were taken by Mr. Ethelston in every case. Mr. Black extended an offer to meet with any of his successors or clients for the purpose of supporting the transition at Capco's request.

51.    During this meeting, Mr, Black, Mr. Ethelston and Ms. Keller mutually agree that July 14 would by Mr. Black's last day of active responsibilities for Capco.

52.     Mr. Ethelston and Ms. Keller asked Mr. Black if he was "ready" to return his equipment on that day. Mr. Black indicated that he was.

53.    Mr. Black offered to first take the time to finish transferring files from his laptop onto Capco's shared drive to preserve the documents that his successors might find useful in the course of continuing to service his book of business.

54.     Mr. Black also offered to send a memo documenting the transition points that had been discussed, as well as Mr. Black's suggested framework for satisfying the constraints in the BPA.

55.     Mr. Ethelston and Ms. Keller expressed appreciation for both of these offers.

56.     Upon information and belief, Capco's file retention policy requires that an employee's Capco network drive is preserved for a minimum of 30 days after their voluntary or involuntary termination.  Mr. Black had previously been given this sort of access to the network drive of other employees after their termination from Capco. Mr. Black expected that his manager, Mr. Ethelston would be given access to his network drive, and as such Mr. Black wished his files to be available on this drive and well organized.  Over his tenure of eight years as a leader at Capco, Mr. Black would have this expectation for anyone who was voluntarily departing the firm.

57.     Mr. Black returned to his office at about 1PM on July 14, 2022, and wrote an email to Mr. Ethelston and Ms. Keller.  While he was drafting this email, as agreed with Mr. Ethelston, Mr. Black was also continuing to sort files from his laptop and save them on Capco's shared drive. In this email, he documented the discussion that had just occurred regarding transition and successor planning, and recommended framework for the BPA. Mr. Black sent this email at about 3PM.

58.     Mr. Black then asked Ms. Keller how she would prefer he leave his automatic reply "Out of Office" message on his email.  Ms. Keller recommended language and Mr. Black set the message accordingly.  Mr. Black then brought his Capco phone and laptop to Ms. Keller's office and left it there.  Mr. Black and Ms. Keller exchanged pleasant goodbyes before Mr. Black left the building for the last time.

59.     In the days after Mr. Black turned in his equipment, but before his final day on the Capco payroll, four Capco employees contacted Mr. Black to discuss

transitions.  In one case, one of Mr. Black's successors, Carl Repoli, asked Mr. Black to meet with a client and create the connection that Mr. Repoli would require to support his continued pursuit of business.  Mr. Black did exactly what Mr. Repoli requested in this case, and contacted the client in question to transition the relationship.  Capco declined to request any additional transition from Mr. Black. Mr. Black has not contacted nor responded to any other clients since his departure from Capco.

### George Black is in full compliance with the BPA

60.     Mr. Black retains no Capco confidential information.

61.     Mr. Black has complied with, and has every intention of complying with, the post-employment restrictions set forth in the BPA.

62.     Mr. Black signed the admission agreements, partnership agreements and other papers that together constituted his offer from Deloitte on the night of Monday, July 18, 2022.  But, as discussed above, Deloitte will not permit Mr. Black commence work until either (i) the 12-month term of the non-compete provisions in Section 6.3.10 of the BPA had expired, or (ii) Capco had issued a written waiver of the non-compete provisions in Section 6.3.10 in accordance with Section 6.5 of the BPA.

63.     However, and upon information and belief, if Capco issues a written waiver of the non-compete provisions in Section 6.3.10 of the BPA, Deloitte will immediately commence on-boarding Mr. Black, and Mr. Black would, within a matter of weeks, commence work for Deloitte, and receive income from Deloitte.

*Capco Refuses To Consent & Makes False Accusations Against George Black*

64.     Mr. Black expected that, as provided by Section 6.5 of the BPA, after he requested permission to join Deloitte on July 13, Capco would engage in a prompt and good faith discussion of his role at Deloitte, so that Mr. Black, Deloitte and Capco could together fashion a role for Mr. Black at Deloitte that would protect Capco's interests under the BPA.

65.     However, for over two weeks after July 13, Mr. Black received no substantive communications from Capco regarding his request for a waiver under Section 6.5 of the BPA.

66.     Then, on July 29, attorneys from the law firm of Weil, Gotschal & Manges LLP ("Weil, Gotschal") emailed a cease and desist letter to George Black.

67.     In their cease and desist letter, Weil, Gotschal informed Mr. Black that they had been retained by Capco to address issues relating to Mr. Black's departure.

68.     The cease and desist letter stated:

> The Company [i.e., Capco] understands that on July 13, 2022, you submitted a request to Mary Keller and Michael Ethelston seeking a waiver of your obligations under Section 6.3.10 of the BPA (as defined below) so that you could accept a position with Deloitte & Touche LLP ("Deloitte"), Capco's direct competitor, in its Risk and Financial Advisory Group. This letter serves as a formal denial of your request.

69.     The cease and desist letter further stated (emphasis in the original):

> To be clear, and in no uncertain terms, if you elect to pursue employment with Deloitte following your departure from Capco on July 29, 2022, or at any time within the Restricted Period, Capco will view such action as an explicit breach of your obligations under the BPA and will take all necessary actions to protect and enforce its contractual and legal rights.

> **Accordingly, Capco demands that you certify in writing, no later than close of business on August 1, 2022, your intent to fully comply with your obligations under the BPA and to refrain from commencing employment with Deloitte until the expiration of the Restricted Period.**

70.     Immediately after Mr. Black received the cease and desist letter, his attorneys, Granovsky & Sundaresh PLLC, reached out to Weil, Gotschal.

71.     In a telephone call on July 29, Granovsky & Sundaresh informed Weil, Gotschal (i) that George Black intended to fully comply with the BPA, (ii) that George Black would not work for Deloitte, and that Deloitte would not permit George Black to work for them, during the BPA's restrictive covenant period, unless Capco issued a waiver under Section 6.5 of the BPA, and (iii) that Mr. Black wanted to engage in good faith discussions with Capco, and to collaborate to create a non-competitive, internal role for George Black at Deloitte that would not affect any of Capco's protectable interests.

72.     Granovsky & Sundaresh informed Weil, Gotschal that Mr. Black would be open to agreeing to a list of Capco clients and/or potential clients that would be entirely excluded from any book of business he might service at Deloitte for the next 12 months. Granovsky & Sundaresh also informed Weil, Gotschal that, in the alternative, Mr. Black would be open to agreeing to take an entire internal, non-client-facing role at Deloitte for the next 12 months.

73.     In a follow-on email on July 29, Granovsky & Sundaresh confirmed in writing to Weil, Gotschal that Deloitte would not permit George Black to work for Deloitte in any role during the BPA's restrictive covenant period unless Deloitte received a

waiver letter from Capco under Section 6.5 of the BPA, and Mr. Black would provide a description to Capco of a proposed non-competitive role at Deloitte

74.    On August 1, Granovsky & Sundaresh provided Weil, Gotschal with a "Compliance Statement," drafted exclusively by Capco and its lawyers and signed by George Black, in which Mr. Black confirmed, *inter alia,* that he had returned to Capco all confidential information belonging to Capco and had destroyed any copies in his own possession, all as provided by the Section 4 of the BPA.

75.    On August 16, Granovsky & Sundaresh informed Weil, Gotschal that Deloitte and Mr. Black had finalized a non-competitive, internal role for Mr. Black at Deloitte, and invited a phone call to discuss the matter.

76.    On August 17, Granovsky & Sundaresh sent Weil, Gotschal a description of the newly created Internal Role for George Black at Deloitte.

77.    However, earlier that same day, August 17, Weil, Gotschal sent a letter to Granovsky & Sundaresh containing a number of false accusations against Mr. Black.

78.    In their August 17 letter, Weil, Gotschal stated that between July 12 and July 14, 2022, Mr. Black attempted to misappropriate Capco confidential information.

79.    Mr. Black did not attempt to misappropriate Capco confidential information between July 12 and July 14, 2022.

80.    Mr. Black did not attempt to misappropriate Capco confidential information at any point in time.

81.    In their August 17 letter, Weil Gotschal stated ("Statement #1") that:

> Forensic examination of Mr. Black's Capco computer has revealed that
> on July 12, 2022, the day before Mr. Black notified Capco of his intention

to leave and accept a position with Deloitte, he attached an external device to his computer containing Chinese file transfer software. Specifically, at 2:37 PM, the user gblc (which was Mr. Black's Capco IT system user id) inserted and accessed a GO! Suite USB Device (Serial: 50A45B5E71b0070). If you are not familiar, GO! Suite is a software program designed to facilitate the mass transfer of computer files and email data to an external source.

82. Statement #1 is false.

   a. On July 12, 2022, George Black did not attach any external device containing any transfer software to any computer.

   b. At no point in time did George Black attach any external device containing any transfer software to any Capco computer.

   c. Upon information and belief, forensic examination of Mr. Black's Capco computer did not conclusively reveal that "he [George Black] attached an external device to his computer containing Chinese file transfer software."

   d. Weil, Gotschal, acting on behalf of Capco, made Statement #1 either knowing it to be false, or with reckless indifference as to whether it were true or false.

83. Capco uses technology that blocks the transfer of documents onto external drives, such as USB devices.

84. Mr. Black was aware on July 12 that Capco used technology that blocked the transfer of documents onto external drives, such as USB devices.

85. Mr. Black was aware on July 12 that if he tried to insert a USB device into his Capco laptop to transfer files, the effort would be blocked and detected.

86.     Upon information and belief, Capco uses technology that prevents employees from transmitting any company documents to personal accounts. It logs each attempt to send a file to a personal account, and only allows transmission if it is for a designated approved purpose.

87.     Mr. Black has never improperly transmitted Capco files.

88.     Capco has never accused Mr. Black of improperly transmitting Capco files.

89.     In their August 17 letter, Weil Gotschal stated ("Statement #2") that:

> on his last day with access to Capco systems," *i.e.* July 14, 2022, "Mr. Black accessed a number of highly sensitive Capco documents. These include, but are not limited to, powerpoint [sic] presentations on Capco's Capital Markets Strategy and operating model. Mr. Black would have no need to access, or proper purpose for accessing, these documents after giving notice and on his last day with access to Company systems.

90.     Statement #2 is false.

    a.   On July 14, Mr. Black had a need to access, and a proper purpose for accessing, all documents he accessed on Capco systems. The documents Mr. Black accessed on July 14 were accessed to complete the tasks he had agreed to complete with Mr. Ethelston and Ms. Keller.

    b.   At no point in time did George Black ever access a document on Capco systems that he did not have a proper purpose for accessing.

    c.   Weil, Gotschal, acting on behalf of Capco, made Statement #2 either knowing it to be false, or with reckless indifference as to whether it were true or false.

91.     Less than two hours after receiving the August 17 letter containing Statement #1 and Statement #2, Granovsky & Sundaresh emailed Weil, Gotschal stating that its letter contained falsehoods.

92.     Granovsky & Sundaresh attorney Benjamin Rudolph Delson wrote to Weil, Gotschal stating, "I want to assure you, categorically, that George has not misappropriated any Capco information.  I have spoken to him in detail about what he was doing on July 12 and 13 and 14, and I will share all of that with you.  He did not any USB storage devices on his Capco laptop on July 12 [sic], and he is at a genuine and complete loss as to what your forensics team is reporting."

93.     Without providing any notice to Mr. Black or to Granovsky & Sundaresh that they were doing so, on that same day, August 17, Weil, Gotschal also sent a copy of their letter, which contained Statement #1 and Statement #2, to Deloitte.

94.     Neither Weil, Gotschal nor Capco had any proper purpose for making Statement #1 to Deloitte.

95.     Neither Weil, Gotschal nor Capco had any proper purpose for making Statement #2 to Deloitte.

96.     On August 19, Granovsky & Sundaresh sent a letter to Weil, Gotschal (copying Deloitte) refuting the allegations in Weil, Gotschal's August 17 letter.

97.     In a telephone call on August 21, Granovsky & Sundaresh again informed Weil, Gotschal (i) that George Black retained no Capco confidential information and that he complied and intended to continue to comply with the BPA, (ii) that George Black wanted to engage in good faith discussions with Capco, and to collaborate to

create a non-competitive, internal role for George Black at Deloitte that would not affect any of Capco's protectable interests.

98.     However, in that August 21 telephone call, Weil, Gotschal informed Granovsky & Sundaresh that Capco would not engage in discussions concerning a role for George Black at Deloitte.

99.     On September 6, Weil, Gotschal sent a letter to Granovsky & Sundaresh stating that Capco would not consent to George Black accepting any role at Deloitte.

100.    In their September 6 letter, Weil, Gotschal stated that Capco "cannot agree to waive any of the restrictions in the BPA in light of Mr. Black's apparent efforts to misappropriate Capco's confidential information. Capco has no faith that Mr. Black would not use or disseminate Capco's confidential information, or otherwise breach or attempt to breach his obligations to Capco, even in the role proposed."

101.    In their September 6 letter, Weil, Gotschal stated ("Statement #3") that:

> Capco understands that the Windows Registry on Mr. Black's device clearly shows that he physically mounted an external drive into his laptop, which the Windows system recognized, read, and assigned a drive letter.

102.    Statement #3 is false.

      a.  On July 12, Mr. Black did not "physically mount an external drive into his laptop."

      b.  At no point in time did Mr. Black "physically mount an external drive into his laptop."

    c.  Upon information and belief, the Windows Registry on Mr. Black's device does not conclusively show that he, George Black, physically mounted an external drive into his laptop.

    d.  Weil, Gotschal, acting on behalf of Capco, made Statement #3 either knowing it to be false, or with reckless indifference as to whether it were true or false.

103.   In their September 6 letter, Weil, Gotschal stated ("Statement #4") that: "Mr. Black violated Capco policy in an attempt to misappropriate its confidential information."

104.   Statement #4 is false.

    a.  Mr. Black never attempted to misappropriate Capco's confidential information.

    b.  Weil, Gotschal, acting on behalf of Capco, made Statement #4 either knowing it to be false, or with reckless indifference as to whether it were true or false.

105.   Weil, Gotschal, acting on behalf of Capco, sent a copy of their September 6 letter, which contained Statement #3 and Statement #4, to Deloitte.

106.   Neither Weil, Gotschal nor Capco had any proper purpose for making Statement #3 to Deloitte.

107.   Neither Weil, Gotschal nor Capco had any proper purpose for making Statement #4 to Deloitte.

108.   Capco has accused Mr. Black of <u>attempting</u> to misappropriate its confidential information.

109.   This accusation is false. George Black has <u>never</u> attempted to misappropriate Capco confidential information.

110.   But Capco does not assert, and has never asserted, that George Black <u>actually</u> misappropriated Capco's confidential information.

111.   George Black has not misappropriated Capco's confidential information.

112.   Capco has no evidence that George Black has misappropriated Capco's confidential information.

113.   Capco cannot identify any confidential information that has been misappropriated by George Black.

114.   Capco cannot identify any confidential information that it believes has been misappropriated by George Black.

115.   Capco does not believe that George Black has misappropriated Capco's confidential information.

116.   Capco's motivations in making Statements #1, #2, #3 and #4 to Deloitte were solely malicious.

117.   Because Capco did not believe that George Black had misappropriated Capco's confidential information, Capco had no reason to state to Deloitte that it suspected that George Black had <u>attempted</u> to misappropriate confidential information.

118.   Because Capco knew that Deloitte would not permit George Black to work for Deloitte without Capco's consent, Capco had no reason to state to Deloitte that it

suspected that George Black had <u>attempted</u> to misappropriate confidential information.

119.   After receiving Weil, Gotschal's September 6 letter, Granovsky & Sundaresh sent correspondence to Weil, Gotschal, confirming that Capco was making no accusation of actual misappropriation by George Black of Capco's confidential information.  Weil, Gotschal did not disagree.

120.   After receiving Weil, Gotschal's September 6 letter, Granovsky & Sundaresh sent correspondence to Weil, Gotschal, asking whether there was any path, shy of litigation, to resolve the dispute between the parties.  Weil, Gotschal did not suggest there was.

### *Capco's Conduct Is Causing George Black Damages*

121.   It is unreasonable of Capco to withhold consent for Mr. Black assuming the Internal Role at Deloitte.

122.   Mr. Black has complied with, and will continue to comply with, the post-employment restrictions set forth in the BPA.  He will do so if he is not working for Deloitte, and he will do so if he is working for Deloitte.

123.   The provisions of the BPA other than Section 6.3.10 fully protect every legitimate business interest of Capco.  For example, the provisions of the Capco BPA other than Section 6.3.10 of the BPA fully protect Capco's interests in preventing George Black from soliciting its clients, its employees, or retaining or using its confidential information.

124.   Because the provisions of the BPA other than Section 6.3.10 fully protect every legitimate business interest of Capco, Section 6.3.10 protects no legitimate business interest of Capco that is not already protected.

125.   Because Section 6.3.10 protects no legitimate business interest of Capco that is not already protected, no legitimate business interest of Capco justifies preventing Mr. Black from immediately joining Deloitte in the Internal Role.

126.   Mr. Black is gravely prejudiced by Capco's failure to consent to his assuming the Internal Role.

127.   For one thing, Mr. Black has been suspended from his career. Because he is currently not working, his professional network is aging.  His skills are not being daily tested and refreshed. He has lost the fun and satisfaction of working and helping clients and colleagues. He endures continuous anxiety about the seven people in his home that he is responsible for financially.

128.   Mr. Black is also suffering economic losses.

129.   Capco is under no obligation to pay Mr. Black anything during the 12-month term of Section 6.3.10, and Capco is not paying him anything.

130.   Deloitte is under no obligation to pay Mr. Black anything before he commences work for Deloitte, and Deloitte is not paying him anything.

131.   In short, because of Capco's unreasonable conduct, George Black has lost his livelihood.

132.    If Capco were to grant consent to Mr. Black assuming the Internal Role, upon information and belief, he would promptly be on-boarded at Deloitte and begin receiving income.

133.    Upon information and belief, every week that Capco unreasonably withholds consent for Mr. Black joining Deloitte in the Internal Role, Mr. Black suffers damages not less than $15,750 in lost income.

134.    Upon information and belief, as a result of Capco's unreasonable conduct to date, as of Friday, October 14, 2022, Mr. Black has already lost over $170,000 in income.

135.    And the economic harm that Capco is causing Mr. Black is compounded by the fact that his earnings as a Principal at Deloitte are determinative of his earnings for various other compensation programs that he is entitled to as a Principal.  Capco's unreasonable conduct has a material compounding effect on the value of these compensation plans.

136.    Upon information and belief, delaying Mr. Black's start date at Deloitte by one year will reduce Mr. Black's projected net worth at age 62 by in excess of $2,000,000.

137.    Capco's motivations in withholding consent for Mr. Black joining Deloitte are solely malicious. Mr. Black has no confidential Capco information, and has already agreed to continue to abide by all of the relevant terms of the BPA, including all of the restrictive covenants in Sections 6.3.1 to 6.3.9. Capco has no legitimate business interests that are served by withholding consent.

***Capco's Recent Conduct Toward Other Former Partners***

138.   Upon information and belief, prior to 2022, Capco regularly permitted former Capco partners who signed the BPA to join competitors, including former partners who have joined Ernst & Young, Cognizant, and Accenture.

139.   But several former Capco partners in addition to George Black announced their departures from Capco in the summer of 2022.

140.   In 2022, Capco has refused to grant consent to any former partner taking any position in the U.S. consulting industry, irrespective of the reasonableness or unreasonableness of any given refusal.

141.   At least two former Capco partners who departed from Capco in the summer of 2022 have been compelled to litigate against Capco, in order to preserve their ability to earn a living.

142.   <u>FIRST:</u> On or about September 8, 2022, Capco filed an action in this court, the United States District Court for the Southern District of New York, captioned *The Capital Markets Company, LLC v. Isaac Halpern*, No. 22-cv-07637, seeking injunctive relief to prevent its former partner, Isaac Halpern, from joining Ernst & Young.

143.   Mr. Halpern had signed a BPA that was substantively identical to the one signed by Mr. Black.  According to his pleadings, Mr. Halpern had sought in good faith to obtain consent from Capco to joining Ernst & Young, including by taking a specially-tailored role at Ernst & Young that would prevent him from violating any of Capco's interests protected by the BPA he had signed.  Capco refused to consent.

144.   On September 16, 2022, Judge Katherine Polk Failla denied Capco's application for a temporary restraining order, and declined to enforce the BPA to prevent Mr. Halpern from starting work at Ernst & Young.

145.   SECOND:   On or about September 14, 2022, former Capco partner Bryce VanDiver filed an action in the Chancery Court for Davidson County, Tennessee, captioned *Bryce VanDiver v. The Capital Markets Company, LLC*, No. 22-1227-II.

146.   Mr. VanDiver also seeks to join Ernst & Young.  In his lawsuit, he alleges that his "good faith efforts to confirm for Capco the lack of any risk of unfair competition on his part have unfortunately fallen on deaf ears," and that Capco has attempted to disrupt his future employment, including by making "materially false and disparaging statements about VanDiver to Ernst & Young."

147.   Through his lawsuit, Mr. VanDiver seeks *inter alia* declaratory judgment that the non-compete provisions of his BPA with Capco are unenforceable as applied to him, and that he should be permitted to join Ernst & Young.

**COUNT I**
***Breach of Contract.***

148.   Plaintiff repeats, realleges, and incorporates by reference the foregoing allegations as if set forth fully and again herein.

149.   The BPA is a valid and enforceable contract.  In the alternative, the BPA is a valid and enforceable contract except that Sections 6.3.10 and 6.5 of the BPA are in violation of New York Law and unenforceable to the extent they purport to permit Capco to withhold consent to George Black taking the Internal Role at Deloitte.

150.   George Black has fully performed all obligations under the BPA.

151.   Capco has breached Section 6.5 of the BPA because it has unreasonably withheld its consent to George Black taking the Internal Role at Deloitte. In the alternative, Capco has breached Section 6.5 of the BPA because it has unreasonably withheld consent to George Black taking the Internal Role at Deloitte, despite Sections 6.3.10 and 6.5 of the BPA being unenforceable to the extent they purport to permit Capco to withhold consent to George Black taking the Internal Role at Deloitte.

152.   George Black has been damaged by Capco's breach of the BPA, including by the loss of income from working at Deloitte during the period when Capco unreasonably withheld consent, in a total amount to be determined at trial but currently not less than $170,000, plus interest, costs and fees.

153.   In the event that Capco withholds its consent to George Black taking the Internal Role at Deloitte for 12 months, George Black's damages will be in an amount to be determined at trial but not less than $2,000,000, plus interest, costs and fees.

## COUNT II
### *Declaratory Judgment.*

154.   Plaintiff repeats, realleges, and incorporates by reference the foregoing allegations as if set forth fully and again herein.

155.   Capco asserts that, under Section 6.5 of the BPA, it is reasonable in withholding its consent for George Black to take the Internal Role at Deloitte. George Black asserts that, under Section 6.5 of the BPA, it is unreasonable in withholding its consent for George Black to take the Internal Role at Deloitte.

156.    In the alternative, Capco asserts that Sections 6.3.10 and 6.5 of the BPA permit Capco to withhold consent to George Black taking the Internal Role at Deloitte. George Black asserts that Sections 6.3.10 and 6.5 of the BPA are in violation of New York Law and unenforceable to the extent they purport to permit Capco to withhold consent to George Black taking the Internal Role at Deloitte.

157.    There now exists an actual, justiciable controversy between George Black and Capco relating to their respective legal rights, duties and obligations under the BPA, which is ripe for adjudication.

158.    Declaratory relief will resolve the legal issues between the parties pertaining to the reasonableness of the Capco's conduct or, in the alternative, the enforceability of the BPA.

159.    George Black therefore requests a judgment declaring that Capco withholding its consent for George Black to take the Internal Role at Deloitte is unreasonable, that Capco withholding its consent constitutes a breach of Section 6.5 of the BPA, that George Black is entitled to damages for that breach, and ordering Capco to provide its consent to George Black taking the Internal Role at Deloitte; or, in the alternative, declaratory judgment providing that Sections 6.3.10 and 6.5 of the BPA are in violation of New York Law and unenforceable to the extent they purport to permit Capco to withhold consent to George Black taking the Internal Role at Deloitte.

## COUNT III
### *Interference with Prospective Business Relations.*

160.   Plaintiff repeats, realleges, and incorporates by reference the foregoing allegations as if set forth fully and again herein.

161.   George Black is party to a valid, enforceable set of contracts with Deloitte, pursuant to which Mr. Black will be admitted as a principal to Deloitte upon the fulfillment of certain conditions, including the earlier of (i) the expiration of the term of Mr. Black's non-compete in Section 6.3.10 the BPA, or (ii) Capco consenting to Mr. Black joining Deloitte by providing a written waiver of that non-compete.

162.   Capco is aware of Mr. Black's offer from, and business prospects with, Deloitte.

163.   Capco, motivated by no legitimate business interest but only by malice, has withheld providing consent to Mr. Black joining Deloitte.

164.   Capco, motivated by no legitimate business interest but only by malice, has made false statements to Deloitte, including Statements #1 - #4, which impugn Mr. Black's integrity as a businessperson.

165.   Capco undertook these malicious acts exclusively to delay the date on which Deloitte would admit George Black as a principal at Deloitte.

166.   Because of Capco's malicious acts, Deloitte has delayed admitting George Black as a principal to Deloitte.

167.   Because Deloitte has delayed admitting George Black as a principal, George Black has suffered damages, including lost income from working for Deloitte, in a total amount to be determined at trial but currently not less than $170,000, plus interest, costs and fees.

168.    In the event that Capco interferes with George Black taking the Internal Role at Deloitte for 12 months, George Black's damages will be in an amount to be determined at trial but not less than $2,000,000, plus interest, costs and fees.

169.    In addition to damages to compensate George Black for his economic losses, George Black is entitled to punitive damages in an amount to be determined at trial but not less than $10,000,000.

## PRAYER FOR RELIEF

Wherefore, Plaintiff respectfully requests that this Court grant the following relief:

(a)    Declaratory judgment providing that Capco withholding its consent for George Black to take the Internal Role at Deloitte is unreasonable, that Capco withholding its consent constitutes a breach of Section 6.5 of the BPA and that George Black is entitled to damages for that breach, and ordering Capco to provide its consent; or, in the alternative, declaratory judgment providing that Sections 6.3.10 and 6.5 of the BPA are in violation of New York Law and unenforceable to the extent they purport to permit Capco to withhold consent to George Black taking the Internal Role at Deloitte.

(b)    An award of compensatory damages in an amount to be determined at trial;

(c)    An award of punitive damages in an amount to be determined at trial; and

(d)     Such other and further relief as to this Court appears necessary and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff, by and through his undersigned counsel, hereby demands a jury trial on all causes of actions and claims for which he has a right to a jury trial.

Dated:       New York, New York
             October 17, 2022

                           Respectfully Submitted,

                           GRANOVSKY & SUNDARESH PLLC

                           */s/ Benjamin Rudolph Delson*
                           Benjamin Rudolph Delson
                           Alexander Granovsky
                           48 Wall Street / New York, NY 10005
                           delson@g-s-law.com / ag@g-s-law.com
                           (646) 524-6001

                           *Attorneys for Plaintiff George Black*

# Business Protection Agreement

## The Capital Markets Company

**THIS BUSINESS PROTECTION AGREEMENT** is entered into between the parties on ~~January 8 2017~~ 2018

Between:        The Capital Markets Company (the "**Company**")

and:        GEORGE BLACK ,residing at:

150 SNYDER AVE, RAMSEY, NJ

("**You**" or the "**Partner**")

WHEREAS:

(a)    The Partner is employed by the Company under a contract of employment dated or on about _____ (the "**Employment**" and the "**Employment Contract**").

(b)    In connection with the disposal by Fidelity Information Services, LLC ("**FIS**") of 60% of its interest in the Group to the entity referred to as the CD&R Investor, the Partner has been offered an opportunity to participate in one or both of the following new incentive schemes:

- Subscription in limited partner units in Cardinal Holdings, LP, a Cayman Islands exempted limited partnership (the "**Partnership**") under the Partnership's Amended and Restated Exempted Limited Partnership Agreement dated 21 July 2017 (the "**Partnership Agreement**"); and/or
- Participation in the Global Long-Term Incentive Plan ("**LTIP**"), for long-term value creation for the Group.

In addition, you may be eligible to participate in new global incentives and reward plans that the Group may decide to implement in the future (subject to the rules of such plan).

(c)    It is a condition of so participating under the incentive schemes referenced under (b) that the Partner enters into a management subscription agreement (the "**Subscription Agreement**") and/or a participation agreement (the "**Participation Agreement**") which in turn requires that any partner who wishes to so participate/subscribe must enter into an amended participation agreement in a form approved by the Group CEO. This Business Protection Agreement is the form so approved by the Group.    The purpose of this Business Protection Agreement is to protect the legitimate business interests of the Company, the Group, the Partnership (if applicable) and the other parties to the Partnership Agreement (if applicable).

(d)    Although the Company hopes that the Partner will wish to so subscribe and benefit from becoming an owner of the Group and/or benefit from participating in the LTIP, the Partner's continued employment is not in any way conditional upon subscribing or entering into this Business Protection Agreement.    The Partner enters into this Business Protection Agreement voluntarily.

(e)    The terms of this Business Protection Agreement shall amend and replace the corresponding terms of the Partner's existing Employment Contract.    All other terms of the Partner's existing Employment Contract shall remain unaltered.

**1.**    **Interpretation**

1.1.    The following terms shall have the following meanings unless the context requires otherwise:

**Capacity**: as agent, consultant, director, employee, owner, partner, shareholder, or in any other capacity.

**Client**: any person, firm, company, organisation or entity which was a client of, or was otherwise in the habit of dealing with, the Company or any Group Company in the Look Back Period and with which, in the reasonable opinion of the Company, you:
   a)    were the client relationship partner;
   b)    were concerned to a material extent;
   c)    had material personal contact; or
   d)    were privy to Confidential Information,
(in each case) during the Look Back Period.

**Confidential Information**: information (whether or not recorded in documentary form, or stored on any magnetic or optical disk or memory) relating to the business, products, affairs and finances of the Company or any Group Company for the time being confidential to the Company or any Group Company and trade secrets including, without limitation, technical data and know-how relating to the business of the Company or Group Company or any of their suppliers, customers, agents, shareholders or management, including in particular (but without limitation):

   a)    business plans, financial information, pricing and fee arrangements, models, flow charts, information regarding costs, profits, markets, products;
   b)    details of actual or potential clients and their requirements, client lists, engagement terms of clients, commercial terms with business partners, client relationship management information;
   c)    inventions, ideas, concepts, know-how, marketing strategies, techniques, designs, discs, operating systems, research and development activities, tooling, designs, software, IT systems;
   d)    litigation, potential litigation or legal advice;
   e)    your Employment terms, the employment terms of other employees, the details of your subscription in the Partnership and/or your participation in the LTIP, the remuneration or performance of other employees;
   f)    global incentives and reward plans, remuneration strategies, recruitment strategies, recruitment plans;
   g)    details of technology, innovation, solutions or thought leadership which are in the course of development;
   h)    plans for present and future development and expansion into new markets; and
   i)    any information which is marked as "confidential" (or similar), or which you are told is confidential or which you should realise to be confidential.

**Group Company**: the Company, the Partnership and each other company, body corporate or other entity (together, an "entity") that, either directly or indirectly including through one or more intermediaries either controls, is controlled by or is under common control with the Company, and "**Group**" means all Group Companies. For the purposes of this definition, "control" means either the power to direct the management or policies of an entity, the power to appoint the majority of the directors or similar governing body of an entity or the ownership of over 50 % (fifty percent) of the voting securities of such entity.

**Key Employee**: any person who is upon the Termination Date or who has been any time during the Look Back Period been employed by, engaged by, or who has otherwise provided services to, the Company or any Group Company at the level of Partner, Associate Partner, Executive Director, Managing Principal, Principal Consultant/Senior Manager, Managing Consultant, Senior Consultant/Manager, Consultant, Associate (or any equivalent seniority as may exist from time to time) or who could otherwise materially damage the interests of the Company or any Group Company if they were involved in any Capacity in any business concern which competes with any Restricted Business and:
   a)    who reported to you on any project team you led;
   b)    who you mentored or whose appraisals you carried out;
   c)    who you have interviewed for employment on behalf of the Group;
   d)    about whom you were privy to Confidential Information; or
   e)    who you personally dealt to any material extent,
(in each case) during the Look Back Period.

**Look Back Period**: the twelve (12) month period immediately prior to the Termination Date.

**Potential Client**: any person, firm, company or entity:
   a)    which was in discussions or negotiations with the Company or any Group Company with a view to becoming a client;
   b)    in relation to which, the Company or any Relevant Group Company had expended significant time or resources with a view to that person, firm, company or entity becoming a Client; or
   c)    to which the Company or any Relevant Group Company had pitched or was preparing to pitch with a view to that person, firm, company or entity becoming a client,
(in each case) during the Look Back Period, and with which discussions, negotiations, efforts or pitch you were either materially concerned, had material personal contact or were privy to Confidential Information (in each case) during the Look Back Period.

**Relevant Group Company**: any Group Company for which you performed services or in which you held office during the Look Back Period.

**Restricted Business**: the business of the Company or any Relevant

Group Company with which you were materially involved during the Look Back Period. The parties specifically acknowledge that the Restricted Business shall include, but not be limited to, the following:

a) the provision of strategic IT advice and support to organisations in the capital markets industry and financial services sector;

b) the advice, design and implementation of IT-architecture projects for companies in the capital markets industry and financial services sector;

c) the design, development and integration of software components and IT-systems in the capital markets industry and financial services sector;

d) the organization and implementation of outsourcing projects for companies active in the capital markets industry and financial services sector; and

e) any other business which the Group enters into after the date of this Business Protection Agreement.

**Restricted Partner:** any other person employed or engaged with the title "partner" (or in a more senior role) with whom you worked in any material respect during the prior 12 months.

**Restricted Supplier:** any supplier of goods or services to the Company or any Group Company with whom or which you had come into contact in the course of the performance of your Employment during the Look Back Period and with whom or which you were involved to a material extent during that time.

**Termination:** the termination of your Employment howsoever caused (including, without limitation, termination by the Company in repudiatory breach of contract) and **"Termination Date"** means the date on which your Employment terminates.

**Territory:** the US, as well as any additional territories for which you are given responsibility during the course of your Employment.

1.2.    In this Business Protection Agreement, unless the context otherwise requires:

1.2.1.    words in the singular include the plural and in the plural include the singular;

1.2.2.    any phrase introduced by the terms "including", "include", "in particular" or any similar expression shall be construed as illustrative and shall not limit the sense of the words preceding those terms; and

1.2.3.    the headings in this Business Protection Agreement are inserted for convenience only and shall not affect its construction.

**2.    Duties**

2.1.    You acknowledge that as a result of the senior nature of your role with the Company, you are a fiduciary of the Company and are therefore subject to an enhanced duty to act in the best interests of the Company at all times. During your Employment, you shall at all times:

2.1.1.    devote the whole of your working time, attention and abilities to the business of the Company and any other Group Company for which you are required to work from time to time;

2.1.2.    faithfully and diligently exercise such powers and perform such duties for each Group Company as may from time to time be assigned by the Company;

2.1.3.    comply with all reasonable and lawful directions given by the Group CEO;

2.1.4.    promptly make such reports to the Group CEO in connection with the affairs of the Company on all matters of which the Group CEO would reasonably expect notice (including your own wrongdoing or that of any other employee, partner, director or consultant of any Group Company or the actions of any competitors which may impact the business or the part of the business for which you are responsible);

2.1.5.    use your utmost endeavours to promote, protect, develop and extend the business of each Group Company (including the stability of its workforce);

2.1.6.    comply with your common law, statutory, regulatory and fiduciary duties; and

2.1.7.    at all times conduct the business of the Company and each other Group Company with which you are responsible in an ethical and lawful manner and comply with all policies and procedures.

2.2.    In the event of any of the following circumstances arising and in order to allow the Company to put in place appropriate succession arrangements, you will report them to the Group CEO as soon as practicably possible:

2.2.1.    you receive during your Employment an informal or formal offer to be involved in a business concern as an employee, partner, agency worker or consultant (or similar) to take effect after your Employment;

2.2.2.    you become aware that any Restricted Partner or Key Employee has received an offer, or had an interview, to be involved in a business concern as an employee, partner, agency worker or consultant (or similar capacity);

2.2.3.    you become aware of two or more Key Employees' intentions to leave the Group at the same time or to join the same organisation; or

2.2.4.    you become aware that any single Restricted Partner intends to leave the Group,

unless such information is already known to the Group CEO or the HR Director.

**3.    Outside Interests**

3.1.    You shall not during your Employment, except as a representative of the Company or with the Group CEO's prior written approval (whether directly or indirectly, paid or unpaid) be engaged or concerned in the conduct of, or become an employee, agent, agency worker, partner, consultant or director of, or assist or have any financial interest in any other actual or prospective business, organisation, occupation or profession whatsoever.

3.2.    Notwithstanding clause 3.1 above, you may hold an investment by way of shares or other securities of not more than 3% of the total issued share capital of any company or entity (listed or dealt in on a recognised stock exchange) without requiring prior written approval.

3.3.    Any outside interests that may have been previously approved by the Company in writing prior to the date of entering into this Business Protection Agreement shall continue to be so approved.

**4.    Confidentiality**

4.1.    You acknowledge that in the course of your Employment you will have access to Confidential Information, and therefore you agree to accept the restrictions in this clause 4. You will not (except in the proper course of your duties, as required by law or as authorised by the Company), use, copy, or communicate or disclose to any person any Confidential Information and/or trade secrets or confidential information of the Company or any Group Company or their affiliates, subsidiaries, clients and vendors.

4.2.    You shall use your best endeavours to prevent the use, copying, communication or disclosure by any other person, company or organisation whatsoever of any Confidential Information and/or trade secrets and confidential information of the Company or any Group Company or their affiliates, subsidiaries, clients and vendors (except in the proper course of their duties, as required by law or as authorised by the Company).

4.3.    The restrictions in clauses 4.1 and 4.2:

4.3.1.    shall include information in the public domain for as long as you are in a position to use such information more readily than others who have not worked for the Company;

4.3.2.    shall continue to apply after the termination of your Employment howsoever arising without limit in time; and

4.3.3.    shall not (to the fullest extent permitted under applicable law) apply to any use or disclosure required by law (including in the course of legal proceedings provided that if you make such disclosure pursuant to a subpoena or final order of a court of competent jurisdiction or other governmental process or other governmental process, you shall, at least five (5) working days prior to making such disclosure, give written notice to the

Company of the request or demand for such disclosure, and the Company shall be afforded the right to participate at its own expense in objecting to or limiting the nature and scope of such disclosure, and to seek judicial protection available for like material, such as injunctions, protective orders and sealed records of proceedings).

4.4. At any time upon request of the Company, and in any event on the Termination Date, you shall:

4.4.1. deliver to the Company all Confidential Information, documents and any copies or any other property belonging to or concerning the Company, any Group Company or any of the Company's clients, prospective clients, leads or business contacts which is in your possession or under your control;

4.4.2. irretrievably delete any information relating to the business of any Group Company stored on any magnetic or optical disk or memory (including on any personal computer, personal device, personal email account or web account), and all matter derived from such sources which is in your possession or under your control outside the premises of the Company;

4.4.3. provide such handover of your duties as the Company shall consider appropriate; and

4.4.4. provide a signed statement confirming full compliance with the obligations under clause 4.4.1 to clause 4.4.3 together with such reasonable evidence of compliance as the Company may request.

4.5. You warrant and represent that your performance of all the terms of this Business Protection Agreement does not and will not breach any agreement by which you are bound, including any such agreement to keep in confidence proprietary information or trade secrets of any prior employer, client or other person, acquired by you in confidence or in trust and you agree not to enter into any agreement at any time during your Employment which conflicts with your duties to the Company.

4.6. You acknowledge that in the event that this clause 4 is breached, the Company will be irreparably damaged. Therefore, should any dispute arise with respect to the breach or threatened breach of any such clause, you agree that, in addition to, and not in lieu of, any and all other remedies available to the Company, an injunction or restraining order or other equitable relief may be issued or ordered by a court of competent jurisdiction restraining any breach of any of such provisions. The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by law.

**5. Non-disparagement**

5.1. You will not, both during your Employment and after Termination, make, publish or issue or cause to be made, published or issued any disparaging or derogatory statements that may be detrimental to the Company, any Group Company, FIS or the CD&R Investor or their respective employees, directors, partners or officers.

**6. Restriction after termination**

6.1. The Company and each Group Company expends considerable resources developing and maintaining its technology solutions (which constitute Confidential Information), developing its relationships with clients and prospective clients and recruiting, mentoring and retaining talented staff. As a partner in the business you are intimately involved and responsible for these efforts. In order to protect its Confidential Information and the investment that the Company makes in developing client relationships, winning new business and maintaining a talented team you agree that it is reasonable that certain restrictions be placed upon your activities after you leave the business and that the restrictions in this Business Protection Agreement are reasonable.

6.2. Further, if applicable, you acknowledge that the CD&R Investor and also your fellow partners who are subscribing for units in the Partnership, have a legitimate interest in ensuring that the goodwill in the business is maintained.

6.3. You undertake to the Company (for itself and as trustee and agent for each Group Company) that on Termination howsoever caused you shall not, directly or indirectly, either alone or jointly with or on behalf of any person, firm, company or entity and in any Capacity:

6.3.1. for twelve (12) months after the Termination Date:

6.3.1.1. solicit; or

6.3.1.2. endeavour to entice away from the Company, or any Group Company,

the business or custom of any Client with a view to providing services to that Client in competition with any Restricted Business;

6.3.2. for twelve (12) months after the Termination Date, solicit the business or custom of any Potential Client with a view to providing services to that Potential Client in competition with any Restricted Business;

6.3.3. for twelve (12) months after the Termination Date,

6.3.3.1. be involved with the provision of services to; or

6.3.3.2. otherwise have any business dealings with,

any Client in the course of any business concern which is in competition with the Restricted Business;

6.3.4. for twelve (12) months after the Termination Date:

6.3.4.1. be involved with the provision of services to; or

6.3.4.2. otherwise have any business dealings with,

any Potential Client in the course of any business concern which is in competition with the Restricted Business;

6.3.5. for twelve (12) months after Termination:

6.3.5.1. entice away from the Company or any Group Company;

6.3.5.2. endeavour to entice away from the Company or any Group Company; or

6.3.5.3. in any way seek to affect the terms of business on which the Company or any Group Company deals with,

any Restricted Supplier;

6.3.6. for twelve (12) months after the Termination Date, in any Capacity, be employed or engaged by any Client in connection with the provision of similar services to those which you are employed to supply to the Company during the Look Back Period;

6.3.7. for twelve (12) months after the Termination Date, in any Capacity, be employed or engaged by any Potential Client in connection with the provision of similar services to those which you are employed to supply to the Company during the Look Back Period;

6.3.8. for twelve (12) months after the Termination Date:

6.3.8.1. employ or engage;

6.3.8.2. solicit the employment or engagement of; or

6.3.8.3. assist any other person (whether by means of the supply of names or expressing views on suitability or otherwise) to employ or engage or solicit or otherwise endeavour to entice away from the Company or any Group Company

any Key Employee (whether or not such person would commit any breach of their contract of employment or engagement by reason of leaving the service of their employer);

6.3.9. for eighteen (18) months after the Termination Date, in any Capacity be employed or engaged by any business concern where:

6.3.9.1. any Restricted Partner already works for or is contracted to work for that business upon the Termination Date and that former Restricted

Partner's employment with the Group terminated within 12 months before or after your Termination;

6.3.9.2.   at least four (4) other Key Employees already work for that business and those Key Employees' employment terminated within 12 months before or after your Termination; or

6.3.9.3.   you are recruited by that business concern in coordination with the departure of any Restricted Partner or Key Employee,

unless (in each case) the Group CEO has given his prior written consent;

6.3.10.   for twelve (12) months after Termination, in any Capacity be involved with any business concern situated within the Territory or which provides services to Clients situated within the Territory which is, will be, or is planning to be in competition with any Restricted Business,

and the Company may (but shall not be required to) maintain a non-exhaustive list of those concerns that it understands to compete (in whole or part) with the Restricted Business.

6.4.   None of the restrictions in clause 6.3 will prevent you from holding an investment by way of shares or other securities of not more than 3% of the share capital of any company or entity which is listed or dealt in on a recognised stock exchange.

6.5.   In the event that you wish to be employed or engaged by a business concern within the scope of clause 6.3.10 but where you will be solely involved with the part of its business which does not compete (or intend to compete) with any Restrictive Business then you may apply in writing to the Group CEO for his approval. Provided that you seek approval prior to accepting such employment or engagement the Group CEO will not unreasonably withhold or delay his consent where he is satisfied with the arrangements for ensuring that you are not involved in the Restricted Business and that there is no risk of the inadvertent disclosure of Confidential Information.

6.6.   The restrictions imposed on you by clause 6.3 apply to you acting:

6.6.1.   directly or indirectly; and

6.6.2.   on your own behalf or on behalf of, or in conjunction with, any firm, company or person.

6.7.   Where the terms of your Employment Contract entitle the Company to place you on "garden leave", the periods for which the restrictions in clause 6.3 apply shall be reduced by any period that you spend on "garden leave". During this period, you will not be entitled to receive any bonus or similar payment unless you are actively working at the Company's request.

6.8.   If you breach any of the restrictions in clause 6.3 or if the Company reasonably considers that you have done so, the Company may elect to extend the period during which the relevant breached provisions apply by a length of time equal to the period during which the breach continues, such additional period to commence on the date on which the original period would have expired. You agree that the Company's right to apply for injunctive relief or damages is not prejudiced by this clause.

6.9.   You entered into the restrictions in this clause 6 having had an opportunity to seek legal advice on the terms of this Business Protection Agreement and whether to enter into it. You acknowledge that the restrictions are reasonable in scope and duration in light of both the Company's legitimate interests outlined above, the level of your remuneration and the commercial opportunity which you have to subscribe for units in the Partnership and/or participate in the LTIP. You also acknowledge that your Employment is not in any way conditional upon your entering into this Business Protection Agreement.

6.10.   Each of the restrictions in this Business Protection Agreement, each sub-clause 6.3.1 to 6.3.10, each of the definitions used in this Business Protection Agreement, each limb of such sub-clause or definition and each operative word within each such sub-clause and definition, are intended to be separate and severable restrictions notwithstanding that they are presented together for the sake of brevity. If any of the restrictions shall be held to be void but would be valid if part of their wording were deleted, such restriction shall apply with such deletion as may be

necessary to make it valid or effective. If any of the restrictions shall be held to be void but would be valid if part of one of the definitions were deleted, such restriction shall apply with such deletion as may be necessary to make it valid or effective, but the deletion in that definition shall not apply to any other restriction.

6.11.   You enter into each of the restrictions in clause 6.3 for the benefit of the Company on its own behalf and as trustee for each Group Company. You will, at the request and expense of the Company, enter into a separate agreement with any Group Company in which you agree to be bound by restrictions corresponding to those restrictions in this clause 6.3 in relation to that Group Company.

6.12.   You acknowledge that in the event that clause 6.3 is breached, the Company will be irreparably damaged. Therefore, should any dispute arise with respect to the breach or threatened breach of any such clause, you agree that, in addition to, and not in lieu of, any and all other remedies available to the Company, an injunction or restraining order or other equitable relief may be issued or ordered by a court of competent jurisdiction restraining any breach of any of such provisions. The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by law.

7.   **General**

7.1.   Upon termination of the your Employment, your rights (if any) in respect of the units subscribed for in the Partnership and any other shares, share option, long term incentive or any other form of profit sharing, incentive, bonus or equity plan or arrangement you participate in shall be solely determined by the Partnership Agreement, LTIP rules or other rules or documents governing each such arrangement which are in force on the Termination Date and you irrevocably waive all claims or rights of action in respect of the loss of any rights or benefits under or in respect of any such incentive granted or not yet granted to you (including any loss relating to the lapse of, or their ineligibility to exercise, any units, share options, the value of any shares or units, the operation of any compulsory transfer provisions or the operation of any vesting criteria).

7.2.   You agree that you shall indemnify each Group Company against all liabilities, costs, expenses, damages and losses (including but not limited to any direct, indirect or consequential losses, loss of profit, loss of reputation and all interest, penalties and legal costs (calculated on a full indemnity basis) and all other professional costs and expenses) suffered or incurred by each Group Company arising out of or in connection with your actual or alleged breach of the obligations set out in this Business Protection Agreement or in the event you assert that the obligations set out herein are unenforceable.

7.3.   You agree to enter into any updated Business Protection Agreement which may be introduced for partners at your level from time to time provided that the duration and scope of the post termination restrictions set out above shall not be materially increased without your express consent. The terms of such agreement shall be deemed to amend and replace the terms of this Business Protection Agreement immediately upon your being given a copy.

7.4.   The Company may assign this Business Protection Agreement to any other company, including any purchaser of the shares or assets of the Company. You may not assign this Business Protection Agreement to any other person, company or entity

7.5.   If your Employment is transferred to any firm, company, person or entity other than a Group Company (the "**New Employer**") by operation of law, you will, if required, enter into an agreement with the New Employer containing post termination restrictions and confidentiality obligations corresponding to those in this Business Protection Agreement for the benefit of the New Employer.

7.6.   You will, at the request of the Company at any time after the Termination Date, co-operate and provide assistance to any Group Company in any internal investigation, administrative, regulatory, quasi-judicial proceedings or any threatened or actual litigation concerning any Group Company where you are aware of any facts or other matters which the Company reasonably considers is relevant to such process or legal proceedings (including, but not limited to, giving statements/affidavits, meeting with their legal and other professional advisers, attending any legal hearing and giving evidence).

7.7.   If there is an inconsistency between any of the provisions of this Business Protection Agreement and the provisions of the Partner's Employment Contract, the provisions of this Business Protection

Agreement shall prevail. All other terms of the Partner's existing Employment Contract shall remain unaltered

7.8. Subject to clause 7.7 above, this Business Protection Agreement and any document referred to in it constitutes the entire agreement between the parties and supersedes and extinguishes all previous discussions, correspondence, negotiations, drafts, agreements, promises, assurances, warranties, representations and understandings between them, whether written or oral, relating to its subject matter.

7.9. You agree that in entering into this Business Protection Agreement, you do not rely on and shall have no remedies in respect of, any statement, representation, assurance or warranty (whether made innocently or negligently) that is not expressly set out in this Business Protection Agreement. You waive any claim for innocent or negligent misrepresentation or negligent misstatement including respect of any statement set out in this Business Protection Agreement.

7.10. No variation or agreed termination of this Business Protection Agreement shall be effective unless it is in writing and signed by the parties (or their authorised representatives).

7.11. This Business Protection Agreement may be executed in any number of counterparts, each of which, when executed and delivered, shall be an original, and all the counterparts together shall constitute one and the same agreement.

7.12. No person other than the parties to this Business Protection Agreement and any Group Company shall have any rights under this Business Protection Agreement and it will not be enforceable by any person other than those parties.

7.13. This Business Protection Agreement and any dispute or claim arising out of or in connection with it or its subject matter or formation (including non-contractual disputes or claims) shall be governed by and construed in accordance with the law of New York.

7.14. Each party irrevocably agrees that the courts of New York shall have exclusive jurisdiction to settle any dispute or claim arising out of or in connection with this Business Protection Agreement or its subject matter or formation (including non-contractual disputes or claims).

7.15. If there is any inconsistency between the terms of this Business Protection Agreement and the Subscription Agreement and/or Participation Agreement then the terms of the Subscription Agreement and/or Participation Agreement shall prevail.   It is agreed that when determining whether there has been a material breach of the restrictive covenants set out in this Business Protection Agreement for the purposes of construing the terms of the Subscription Agreement and/or the Participation Agreement then the laws of the Cayman Islands shall apply to such determination and the parties shall submit to the exclusive jurisdiction of the Delaware courts in relation to such determination.

7.16. The obligations of you pursuant to this Business Protection Agreement shall survive any termination of this Business Protection Agreement.

**Executed and delivered as a Deed**

Signed as a Business Protection

Agreement by  GEORGE BLACK                              Signature

in the presence of a witness:

Name: DEANE MARTIRE

Address: ...............................                        Signature

27 TREADWELL AVENUE
WESTPORT, CT 06880

Occupation: PARTNER, CAPCO